The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Please be seated. We will begin with Huynh v. Bindy. Thank you, Your Honor. May it please the Court, Alex Buda on behalf of the petitioner, Mr. Huynh. This petition presents two independent reasons for vacatur. First, the BIA required more than reasonable diligence. It discounted petitioner's actual efforts, retaining three lawyers, twice filing motions for post-conviction relief, and then acting promptly once removal became a real possibility, and instead faulted him for not continuously monitoring legal developments. That is not the standard this Court announced in Williams, and it makes no sense under petitioner's unique circumstances where the government could not remove him. The Board's contrary analysis reflects both a legal error and a misreading of the record. Second, the BIA's sua sponte decision rests upon a legal misunderstanding. It treated this as a routine case of newly available relief without engaging the distinct change in law argument that petitioner actually presented. Can I ask you about the change in law? Your argument, as I read it, is based on two changes of law, right? Because there were two grounds at issue here. And in your brief, you say that after DiMaia, petitioner didn't have any rights to pursue yet. It wasn't until Belcher that he had any rights to pursue in reopening. Right? That's page 23 of your brief. Yes, Your Honor. But now that we have rejected petitioner's Belcher arguments in Perdomo v. Uloa, does the petitioner now, again, have no rights to pursue in reopening? No, Your Honor. So to be clear, I think the right way to think about this question, about how Perdomo impacts this case, is whether this case is now moot or whether remand would be futile. And the answer to both of those is definitely no. Petitioner has a viable pathway to relief through adjustment of status if the agency grants him an inadmissibility waiver. That waiver is discretionary. This was the alternative argument. Is that part of the reopening? Is that part of what was in front of the agency before and is in front of us now? Yes, Your Honor. So the principal argument in the motion to reopen was that he was no longer removable because both charges were no longer valid due to the changes in law. We acknowledge that after Perdomo, he remains removable on CIMT grounds. So this case is now about the alternative request for relief, which was adjustment of status with the grant of a discretionary waiver. Can I just ask you about how that doubles back to what Judge Rushing said? So the idea is that even though your second argument now doesn't work, you argue that there's still real things at stake for your client because even if your second argument doesn't work, there are things that he could still get. But that suggests that he had an argument after DiMaia. I don't know how you can get the horns of the dilemma of if the argument is the reason he didn't need to do something more shortly after DiMaia was because there's nothing to do, but now that second thing doesn't apply anymore, he still has an argument. That suggests he had an argument. Maybe not the full argument. Maybe not the best argument. Maybe not the most thing he wanted. But this seems to be a paradox in that to me. I appreciate that, Your Honor. And I think it's important to remember that when we brief this case under a completely different legal landscape, and there is a significant difference between someone who cannot be removed from the country at all versus someone who has a pathway to relief through a discretionary waiver. So I appreciate that argument that he didn't have any rights to pursue after Belcher. It reads quite stale now. But the point is that the question for this court now is after Perdomo, what does the court have to do in this case? And my argument is simply that there's no way this case can be moved because he has a concrete pathway to relief here, and the only way he can get that relief is by getting the board to grant his motion to reopen. So just to clarify, though, is that pathway to relief was available before Belcher was decided? It was, Your Honor. Yes, it was. Okay, and so the BIA, when it assessed diligence without mentioning Belcher, that's all relevant now. It's not an improper review at this point. So I appreciate that question. I think the answer is that the board still did err when it completely disregarded his Belcher argument because the board did not address the argument that Petitioner actually presented. This court has held that that is a legal error. But that doesn't matter now, right? The Supreme Court tells us that if the agency would be required to reach a certain outcome on that point, then we can. Sure. So I appreciate that. Yes, Your Honor. So I appreciate that the import of that legal error is no longer here because of Perdomo. But the point, though, remains that the board still erred in denying diligence and in denying Jesus Ponte reopening requests under the wrong understanding of his motion, and now we still think that the board, we still need a remand so that the board can reassess those questions under the correct legal understanding because that's his only pathway to get reopening and to ask the agency for a discretionary waiver so that he can adjust status. It concerns me that the delays in this case were a matter of years. No matter what order, BIA order, you're talking about, even after DiMaia, which came in 2018, Belcher, 2022, you're still waiting years to file a motion to reopen. You're asking us to excuse a rather long period of delay. So, Your Honor, I think this case is unique because there are two unique circumstances, and I kind of want to disentangle those a little bit more so than we did in our brief. So the first is that the petitioner took significant action right after he was ordered removed. He hired a lawyer to seek post-conviction relief in 2005. That lawyer actually obtained the prosecutor's… He said he took significant action, but isn't the only significant action for herald purposes when the motion to reopen was filed? No, Your Honor. So I think the point that I'm making is that the context before petitioner had rights to pursue after DiMaia is enormously important to understanding what reasonable diligence looks like once he gets rights after DiMaia. So the point I am making is that after he was ordered removed, petitioner hired two different lawyers who sought post-conviction relief. They actually filed motions, and the board completely disregarded this evidence, which we think is a legal error. So he hired two lawyers who unsuccessfully pursued post-conviction relief. Even coming into the present, I mean, what rights would DiMaia and Belcher give you? Because the matter of a ruse, it wasn't even part of the statute of conviction. Ruse didn't play into the statute of conviction. And then when you look at Belcher, it's clear from our opinion in Yaloa that 12 months or one year or whatever, that all of these periods of time are the same. They're not a year and a day or a year or whatever. They're not distinct from one another. But at the end of the day, I'm just not sure what either DiMaia or Belcher gives you. I mean, what rights are left? Yes, Your Honor. So we contend that petitioner is no longer removable as an aggravated felon after DiMaia. We think that's actually quite a straightforward application of the categorical approach to the statute. And I appreciate that ruse was not in the statute, but I don't think that makes any difference to the categorical approach analysis. But I want to be clear that this court does not have to grapple with any of those questions, because those are questions for the agency in the first instance, and the BIA did not even reach any of that. So the BIA denied simply on diligence grounds. That is the central issue before the court today. We don't think the court has any reason to address any of those questions, but I would contend that it's quite a straightforward analysis that he's no longer an aggravated felon after DiMaia. Can I ask you about what strikes me again? Now that we're in the world we're in, and I appreciate that when you wrote the briefs, the things were different. So let's change one fact. Let's imagine that counterfactually your client had sought relief pretty immediately after DiMaia, had filed for reopening almost immediately after DiMaia, right? And the board denied it at that point, like right after DiMaia. Am I correct that he would clearly be time and number barred in that situation? Now, if he tried to do it again now, he'd be both time and number barred? Yes. So doesn't it seem a little strange that he would, under your argument, he is better off because he didn't file right after DiMaia than if he had filed right after DiMaia? Well, Your Honor, I would contend that it would be quite a difficult – the government would have a much more difficult case, in your hypothetical, of defending the denial back. Oh, no, no, that's gone. That's over. Like he does it in the immediate aftermath of DiMaia, and people at the time haven't really thought through the implications of DiMaia, so it's barred. So we add that fact, and then we keep everything else about the case the same, and you're here in the same posture from the same denial of motion to reopen. But in this situation, the BIA says, what are you talking about? You're time and number barred now. And we were reviewing a petition for a review for the BIA saying you're time and number barred. I don't think that would change the analysis today. We would still be making the same equitable tolling analysis because equitable tolling can overcome both time and number. Well, I don't think that person could have made an equitable tolling analysis because that person filed right after DiMaia. They would – you know what I'm saying? They're just trying to do it again. Yeah, I understand, Your Honor. I think there's no – I think the analysis would be exactly the same today because we would still be seeking equitable tolling because of the number bar in your hypothetical. I don't think that really changes where we are today or what the analysis would look like. But to go back to the diligence issue, I think there are two unique circumstances here. I've already touched upon his actual efforts. And I want to be clear that other circuits have held that that on its own is sufficient to warrant not taking further action until there's a good reason to do so. So the Sixth Circuit in Gordillo says when a petitioner gets advice from multiple lawyers who all tell them the same thing, there's no reason to question that until you have a reason to. And in Gordillo, it was the person who was apprehended by ICE several years later. And then also in this case, we have the unique circumstance of where the government could not remove the petitioner. And he experienced that firsthand. In 2007, he was detained by ICE. The government couldn't remove him. They had to release him. And all of his lawyers, all three, correctly told him that there's nothing that you practically need to do because the government can't remove you. Could I ask you a question about comparison between this case and Williams? Sure. So let me offer, I think the government makes these, the following differences between this case and Williams. And this even assumes that Belcher is even relevant at this point. So as I understand it, the differences between this case and Williams are it's at least a year longer in this case than it was in Williams, right? Yes. Unlike in Williams, your client was in the United States, not in Jamaica, right? Right. So why don't those two things matter? And your client has access to more funds than the client in Williams. Sure. So I don't think. Does his family around him to help and support him? Yes. There are a number of factors. Judge Wilkerson, I see I'm out of time. I answered the questions. You may answer the question briefly. Yes, Your Honor. Thank you. So I don't think those distinctions matter. First, the distinction about him being in the United States versus abroad. I actually think that distinction helps us. In Williams, you know, Williams from the day he was removed was inadmissible and could not return to the United States to see his children. And for 12 years, he admittedly, this is in the record, Williams did absolutely nothing. And the court excused that. Or, you know, the court said that was reasonable under the circumstances to not continuously hire a lawyer throughout those 12 years because of his financial circumstances. And I appreciate that there is, you know, some differences between the financial circumstances here and in Williams. But I don't think there's much daylight there. I think, you know, the record here is clear that William or that petitioner only has an income of about $40,000 a year. That's at JA-221. There's actually a continuous motion at JA-580 where a petitioner told his lawyer during removal proceedings that he didn't actually want to file a brief. Sorry, my last point. He didn't want to file a brief on the key issue, whether he was an aggravated felon, because he could not afford it. Thank you. Thank you, counsel. Thank you. Signs. Good morning, Your Honors. Rodolfo Signs for the U.S. Attorney General. This court should deny the petition for review for the reasons based in briefing. Can I ask you about extraordinary circumstances?  The argument here is that a change in decisional law removed an extraordinary circumstance that stood in the way of filing within 90 days, right? And that was the argument in Williams and these other cases, that the law changed 10, 20 years later, and that qualifies as an extraordinary circumstance that should toll the time. Correct. The BIA has held that, I presume, and the government supports that theory? I hesitate to answer yes in terms of the board, just because I'm not familiar with an exact case, but this court has held that. Yeah, it just strikes me that it leads to these sorts of very strange arguments, where we are comparing Mr. Williams from a previous case and this case, and we're asking the question, how often do we expect a reasonable person who has been ordered removed from this country to be checking in with an attorney about whether the law might have changed, right? That doesn't seem reasonable really ever, but we end up in these bizarre situations where we're comparing, well, like, are you, like, so rich that we expected you to be checking with an attorney all the time? Or was your situation so hopeless that we expect you never to check with an attorney? It seems like the root of the problem might be that a change in decisional law is not an exceptional circumstance, doesn't it? I don't want to give a blanket rule, because there could be, depending on the facts of a case, a different scenario where it might be. But I think Your Honor raises an important distinction between beliefs about the likelihood of being removable, which is what is being argued in this case, and the complete impossibility of removal. Well, how about the impossibility that we weren't removing people to Vietnam? Well, that fact is not in the record, Your Honor, and this Court's limited to that. You're here on behalf of the United States government. Presumably you are prepared to represent when the government was removing people to Vietnam or not, right? It doesn't seem entirely clear to me, Your Honor. You're not prepared to address his repeated assertions that I didn't think I was going to get removed because the federal government was removing no one to Vietnam for years? Our position would be that it – I'm not asking your position. I'm asking you if you're prepared to represent whether or not the federal – or to dispute his repeated assertions in his brief, which he asserts over and over again. I know you've read his brief. Are you disputing his assertions that the United States was not removing people like him to Vietnam? In his brief, and he drops a footnote to certain articles – I cannot believe that – I was a federal government attorney. I cannot believe that you are not prepared to answer a factual assertion about what the executive branch was doing. Let me answer it. So in 2008, there was a repatriation agreement that allowed some individuals from Vietnam to – And he asserts that under that you can't remove someone like me. In any event, it doesn't matter, Your Honor. So you're not – wait. Again, you are not prepared to address – he makes this assertion. You are not prepared to say whether he's lying when he says that? I'm – admittedly, Your Honor, I do not know the exact – So you cannot represent whether – when the United States government decided to start removing individuals like this individual to Vietnam. It's the cornerstone of his argument. The reason I didn't think I needed to do anything is because my attorneys repeatedly told me that someone like me is never getting removed to Vietnam. I did reach out to DHS counsel to find out when they did – And they just didn't answer you? Sorry? They just didn't answer you? They informed me that they're currently removing individuals. I didn't – he didn't – no one's arguing that. The question is when. His whole argument is it was reasonable for me to not worry particularly about getting removed to Vietnam because the executive branch was not removing anyone like me to Vietnam. Anyone like him but other individuals, sure. Who cares about other individuals? If I'm him, I care about me. But there's still no factual nexus between that reality and this person in particular and whether it was believed by that person informing the – I'm going to give you one more chance to answer my question. Do you know or are you prepared to controvert his assertions about when the federal government started removing people like this individual to Vietnam? I'm not sure, Your Honor. No, I cannot answer that. Could you please look into it and submit an update? Because at least I think that's relevant.  I'm happy to do so. What difference does it – what present practical difference does this make at this point? Because it seems to me that the decisions that you're opposing counsel rests on a demeanor and voucher or whatever. And I don't understand at this point what rights are left. I mean, are we going to hold that the board abuses discretion in not reopening? But what – in light of the fact that Ruse was not a part of the statute of conviction, it would seem to take DiMaggio out of play. And the voucher in our recent decision in Yaloa indicates that, you know, these distinctions that he wishes to draw are simply unavailing. So what practically are we left with? And the opposing counsel says we don't need to get into merits, but I certainly wonder, you know, what lies ahead. You can say the board abuses discretion, but there's no there there. I agree, Your Honor. The only argument that was made in the opening brief was the one about Ruse. And as it was discussed earlier, that it was beyond the scope of the statute of conviction. So that takes that out. I think opposing counsel was arguing that there could be a possibility for a waiver to adjustment because for adjustment, you need to be admissible. So if there's no dispute that he's inadmissible with the CIMT, he needs a waiver in order to show that he could – Does the length, does the sheer length of time and the length of delay in moving to reopen, does that matter? You know, this is – to say that the petitioner has a – that the board abuses discretion or whatever, in the face of years-long delays in moving to reopen, what kind of precedent does that set? That there's an abuse of discretion despite the fact of, you know, extraordinary delays. I mean, sometimes things are matters of degree. And we're not talking about a day or a week or some sort of arbitrary tripwire. We're talking about years. Correct, Your Honor. And I think the result would be that there would be an incentivization to delay or to reward. Okay. I'm as sure as I can be of anything that you think that Williams was deeply mistaken, but you understand that that is a penal decision of this court, right? Yes, Your Honor. Okay. So Williams says changes in law can be – can cover blah, blah, blah. So I would like you to – you believe that what this individual did isn't an extraordinary – isn't diligence, right? Correct. What would have been reasonable diligence in your view? I – Keeping in mind that we are bound by Williams, so you can't give me an answer that says Williams is wrong. Sure. I think it's important to look to an important fact here, that in 2010, at the last juncture that he interacted with counsel in terms of sentencing modification, the sentencing modification indicates that he was advised that he could be – that he was on the list to be deported. That was the last interaction he had with counsel. So it refutes the belief that he was unable to be removed at that point. That is not the basis on which the BIA denied relief in this case, right?  Okay. So how about we try with something that fits sort of with what the BIA actually said? Sure. Well, there's – as the BIA said, there's no evidence of any action being taking place between DeMai in 2018 and – You're just like, it's too darn long. It's too darn long. It's too darn long. I can cite cases that – in fact, Judge Kethledge, I thought, just explains very well. It's too darn long. Standing alone in and of itself does not refute a finding of diligence, right? Surely you're familiar with the Sixth Circuit's decision in Gordillo.  Which says very clearly mere length of time alone is never sufficient. Right. But it was in the ineffective assistance of counsel and in Williams, this context, and in Williams, this court distinguished between ineffective assistance of counsel and changes of the law. Those two situations require different applications of law.  But so now – but I don't think that changes the prospect that – oh, so your view is that in this context, there is a – it's just too darn long exception? That you think standing alone, the sheer length of time by itself could be sufficient? That's what Lawrence said, that length of time is an important consideration. Important consideration is not – like, when you say something is an important consideration, that's not to say that standing alone is sufficient. Sure. But there's a seven-year gap of no action that's based on the record. And then there's contradictory evidence as to what the belief of removability was prior to that, ten years before that, when he was interacting with counsel and trying to do something with his case. I do think it's important to reiterate some factual distinctions in the record also about 2004 and 2007 and 2010, which is what is being relied on here to speculate about what was believed between 2018 and 2025. In 2005, he filed another sentence modification motion, which contained the exact same language in the 2010 that he had been advised that he was on the deportation list. After that sentence modification motion was unsuccessful, his counsel at the time sent him a letter that indicated that – or recommended that he might try to dispute that he has a CIMT. And it was forlorn that there couldn't be much more to do about stopping his deportation. So we have other evidence in the record, and I'm happy to point to the court. Now we're back to, again, a prediction about whether we're going to remove this individual to Vietnam in a case where you can't literally tell me whether the government was removing people to Vietnam. Correct, Your Honor. I just feel like this feels like a really important part of your argument. I mean, I am genuinely flabbergasted that you can't answer that question. But it doesn't matter, because we know nothing about his beliefs and what he was thinking during that time period. All we know is that he took no action during that time, and we're speculating about his beliefs based on what he's told us. It's speculation to take a person's word for their own – their explanation for their own behavior? There's nothing in the record itself that he believed that he could not be removed because of the government's not coming to an agreement about whether or not they could remove people to Vietnam. Other than the documents he's filed asserting that. Other than the – which documents? You know, his filings in this case in which he asserts that. Correct, the assertions of counsel. So you think he needed, like, a verified affidavit or something? Or maybe a hearing? A hearing is one way we could find out what he believed and when and why. In 2010, he had been advised that he could be deported. The least we could expect him to do is to inquire whether that's actually the case again. But we don't have evidence of any action being taken between 2010 and 2025. So what about all the cases in his – in his 28J letter, he cites all these cases that says one of the things that's about – you know, it's reasonable to expect that an individual began to take action to challenge removability once that individual learns they are removed to a country and they're no – like, why doesn't that logic apply here? The argument that's made in his 28J, why does that – why do those cases not just squarely apply here? Sure. It was, again, in the ineffective assistance of counsel. All right, I just pulled up Gordillo, and I do not think that is a fair description of Gordillo. They talk about ineffective assistance of counsel, but where they talk about diligence is not in the IAC section of that opinion, as I read it. Okay, that's a fair distinction. That's a pretty important distinction because that's what you said in response to my question about Gordillo. Yes. So, okay, so taking that off the table, how do you distinguish Gordillo? I think here there's a longer period of time that passed between when counsels had been involved with the petitioner and made representations to him, and here where there was at least a 10-year gap before DiMaia even came out. So our position would be that there's a different record in terms of the length of time, and there's also a difference in terms of what was believed and done after the fact that there was an extraordinary circumstance that changed things. In normal civil litigation, the advice that counsel makes or the strategic decisions that counsel makes or whatever, even if they turn out to be erroneous, they're still charged to the client. And how does that principle figure here? At what point are counsel's advice even bad advice? It still is charged to the client. Normally that's the case. It's certainly subject to an ineffective assistance of counsel claim, but I worry about having a—we seem to be moving more and more to special protections in the immigration context that are probably beyond the protections that we allow in normal civil litigation. So at what point does counsel's decision, even an erroneous decision or a bad decision, at what point does that become chargeable to petitioner under the normal rules of lawyer-client relationships? Agreed, Your Honor, that it's definitely not indefinite, but we have the guideposts here from Williams and Lawrence. Williams said a year of waiting was reasonable. Lawrence said that two years after change in law was unreasonable. So we have a general idea of how much time that could be. I hesitate to draw a specific line, but here we have seven years, which should be more than enough inaction to start to see that there should have been a minimal effort to be made to see if there's anything that can be done for the case or if there's something that has changed in terms of the policies that DHS has about removability. We're in a situation in many of these immigration cases where the strategy is simply to delay, delay, delay in the hopes that some favorable decision will come along. And delay is looked upon as a valuable strategy regardless of whether the delay is well-founded or not. But the whole idea in these immigration cases is just to string it out and delay it and delay it and delay it. And lawyers have every incentive to do that because particularly if we say there's equitable tolling here, I'm wondering if we're not increasing or feeding into this whole situation where delay is a vital and acceptable part of dealing with the courts. And you look at what's happening with the Supreme Court and what's happening with Congress, and they're shortening limitations periods. And you have many decisions like McKinnon and others which say these deportation proceedings should proceed efficiently. But if we allow equitable tolling for very, very long periods of time, you get the idea that the courts are moving in one direction and Congress and the Supreme Court are moving in a different direction. And what do we do with that? Because there's no mistaking when you look at the Supreme Court decisions and you look at the congressional enactments and you look at the federal rules and Rule 26 says there has to be specific authorization in a statutory limitations period in order to extend the time. And it just seems to me that Congress is trying to say this has got to move efficiently. Whether we like it or not, the language of these statutes, they say they must be filed within a certain amount of time. They must be. And then you look at the federal rules and they say, well, in order to extend that time, there has to be specific authorization under law. And it's clear that Congress and the Supreme Court are trying mightily to have these proceedings not drag on indefinitely. I see I'm out of time, Your Honor. All I'm asking is, are we in danger of establishing a serious riptide to the trend that the Supreme Court and Congress are very, to what they're very intent on doing? Do you understand what I'm saying? Definitely, Your Honor. So is the reason this individual hasn't been removed for years because he's been filing and obtaining stay after stay or because the federal government hasn't removed him? It's unclear. Really? He's been checking in with immigration for years. This does not sound like a case where the reason it's been going on so long is because he's been dragging his feet. Right. That goes back to, I think, the distinction between beliefs about the possibility and the government made no action whatsoever to remove this individual for this entire time. And as soon as he was picked up in immigration detention, he tried to reopen, right?  So it's not his fault we've been here this long, is it? In that regard, yes, Your Honor. This is not a death row inmate who's filing appeal after appeal after appeal, right? Right. But he knew that he had a removal order. And the removal order was still active. And so I think the burden would be on him to show that there was something to do about that removal order and to get rid of that danger of possibility, however so small. Just to answer quickly Judge Wilkinson's question, if I may, I think it's helpful to look at Judge Rushing's dissent in Williams, which said that the whole purpose of diligence can be swapped. Wait. We're interpreting this Court's binding case law in light of what dissent said now? No. I'm just citing persuasive reasoning, Your Honor. Dissents aren't persuasive. By definition, dissents are dissents. I mean, we could differ on whether the dissent is persuasive reasoning. Thank you for your argument. Thank you. The other thing is I just want to point out in terms of the government's action, the removal order is still out there. Now, I'm just not sure that if the government has not moved to enforce the removal order. I'm just not sure that that sets in motion equitable tolling because the removal order is there. And if you don't like it, they have every incentive in the world to try to get that removal order taken away and resolved. And whether the government seeks to enforce it or not, it doesn't change the underlying fact that the removal order is there. It's in petitioner's interest to get that removal order overturned. And whether the government tries to enforce it or whether it doesn't enforce it, the order is still there. And the burden lies on petitioner to get it overturned. And equitable tolling is an extraordinary remedy. It's supposed to be used sparingly. So I think that's an important closing remark. Thank you. Thank you. Mr. Booty, you have some rebuttal time, sir. Thank you, Your Honor. If I might just pick up that point where Your Honor was going. This case is quite different than the ordinary case where the government is simply not exercising its discretion not to remove him. The government tried to remove him in 2007. It detained him. It could not remove him. And so after that, after experiencing that, petitioner reasonably understood that there was nothing the government could actually do to remove him. And I want to be clear that the record is clear. There is a basis in the record for his understanding that the government could not remove him. He explains in his affidavit at JA 262 that he is annually checking in with ICE. So every year he's going to the government and telling him, hey, good to see you. We're not, we can't remove you. And so he's going about his life. And that's the perfectly reasonable thing to do in those circumstances. Can I ask you about the period of diligence that we assess? I thought the argument from your brief was that consistent with our case law, we look at when the exceptional circumstance was removed, and we look at the diligence from then until he moved to reopen. Is that right? You were faulting the board for looking from DiMaia to reopening. Do you think they should look from Belcher to reopening? Yes, Your Honor. So what did he do in that period? It seemed like it was more than two years of doing nothing. Yes, Your Honor. If we look from Belcher to when he moved to reopen. That's right, Your Honor. The point we are making is that the context of everything that happened before that period of time is what makes his, is what explains. It all comes down to context. Yeah, I understand that. It's just I want to keep our perspective on the question before us is reasonable diligence. Right. And in some cases someone might have done something. And we're assessing was the thing they did reasonable diligence? You know, they tried this. They tried that. They asked for advice. They got bad advice. You know, but was that reasonable diligence? But instead here we have more than two years of just nothing. So we're assessing was doing nothing reasonable diligence for over almost two and a half years. So, Your Honor. And we're comparing the nothing he did for two and a half years to the nothing Mr. Williams did for one year to see which one is more reasonable. So, Your Honor, the reasonableness of what diligence looks like once someone has rights to pursue has to be informed by the context of what happened before they had rights to pursue. Right, sure. I just, there's not much to. To compare. There's not much to look at, right? Sure, sure. Diligence, reasonable diligence implies something, some diligence, that there is a standard of we require you to do something. And we will assess whether that was reasonable. But it's a, it's a, to have nothing to go on, right, that the petitioner did nothing for two years doesn't, you know, I take your point that we have to understand why and look at the history. But that would seem to suggest that in every case doing nothing is fine. And that's reasonable diligence because, well, we couldn't expect you to be doing anything. So we certainly don't think that it's in every case reasonable to do nothing for the period of time that you have rights. We think this is a very unique case where that's reasonable. And that's only informed by the context here. And to just, can you walk what the context is, including his illness that you talk about in the brief? Yes, Your Honor. So the context that we think informs his diligence is he hired two lawyers who unsuccessfully pursued post-conviction relief. He hired an attorney when the government detained him in 2007 and could not detain him. All three of those lawyers told him there's nothing more you practically need to do because the government cannot remove you. And, by the way, there's also no path to relief at the time. And that was accurate advice at the time. So the argument is there's an order of removal. The government has ordered you to leave the country, but they probably can't do anything about it. So you don't need to leave. Well, it's not that they probably can't do anything about it. They can't enforce it, right? They've ordered you to leave, but, you know, come and make me. They cannot enforce it. And I just want to be clear. There's no meaningful consequences to that for a petitioner because he has a work permit to work lawfully in the United States, and he has nowhere to go. So there's really no meaning. He had no reason to act until the government detained him. And the through line in these cases that we cite in the Sixth Circuit's decision in Gordillo, the Ninth Circuit's decision in Escalian, the through line in those decisions is that in these unique cases where the government either can't remove you or you've tried repeatedly to pursue relief and you're unsuccessful, the through line is that the key moment becomes when there's a reason to act again. In Gordillo, the reason was because ICE detained the petitioner. In Escalian, it was because the government said, Armenia is now accepting people like you and we can remove you. And in this case, it's when the government detains him in 2025. And as soon as the government does that, he promptly retains a lawyer who files a motion to reopen just over a month later. So it's not really the change in law that's doing the tolling. It's the government's inability to enforce its removal order that's doing the tolling. That is explaining why that course of action is reasonable, which is the inquiry for the tolling. Yes, sir? There's a danger here of turning everything on its head because we normally accord a great deal of discretion to the BIA in terms of whether it declines to reopen. And we say that the board is due a great deal of deference in whether it decides to reopen or not. And we seem to lose sight of that. And it's also his burden to overturn, and we seem to be sort of shifting that. And I think both in terms of the burden to overturn and the standard of review, we're kind of turning those on its head. This decision kind of runs the risk of turning those basic rules of respect for the board's discretion and acknowledgment that the burden in the final analysis lies with someone facing an order of removal to take every step possible to overturn it. And yet, both in the question of whose burden it is and what the standard of review is, we seem to get farther and farther and farther away from it. That's part of the problem here, it seems to me. Your Honor, I see I'm out of time. May I briefly respond? Do you have something to say that you haven't said before? Yes, Your Honor. So I agree that the board has enormous discretion here whether it ultimately wants to grant relief, and that is precisely why we want a remand is to ask the agency for a discretionary waiver. That analysis is much different now after DeMaio. So we would ask this court to remand so that the agency can waive equities here and exercise its discretion against the correct legal backdrop. Thank you. And I see that you took this case pro bono, and we very much appreciate you doing so. Certainly there's been no lack of due diligence on your part. Thank you. Thank you, Your Honor. We thank you. All right, we're going to come down and re-counsel, and we will recess court and reconstitute the panel. This honorable court will take a brief recess.
judges: J. Harvie Wilkinson III, Allison J. Rushing, Toby J. Heytens